54 CCPA

Edward L. ENGELHARDT, Appellants,

v.

Claude I. JUDD, Alexander E. Drukker
and John H. Biel, Appellees.

Patent Appeal No. 7642.

United States Court of Customs
and Patent Appeals.

Dec. 15, 1966.

John P. Floyd, New York City (Albert W. Rinehart, Washington, D. C., Raymond Underwood, H. E. Westlake, Jr., I. Louis Wolk, Rahway, N. J., of counsel), for appellant.

Herbert S. Sylvester, New York City (Richard K. Stevens, Washington, D. C., George H. Mortimer, New York City, of counsel), for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Board of Patent Interferences awarding priority of invention in Interference No. 92,376 to senior party Judd, Drukker, and Biel (hereinafter Judd), who are involved in this proceeding on the basis of their patent No. 2,985,660, which issued May 23, 1961, on an application filed April 29, 1960. Junior party Engelhardt filed his application serial No. 115,910 on June 9, 1961, admittedly after seeing a copy of the patent granted to Judd.

Count 1 is representative and is directed to a specific compound, 5-(N-methyl-4-piperidyl)-5H-dibenzo[a, d] cycloheptene, which has the following structural formula:

The junior party took testimony in the proceeding while the senior party relied on the filing date of the Judd patent. Since the Engelhardt application was filed subsequent to issuance of the senior party's patent, it is well settled that the burden is on the junior party to prove actual reduction to practice of a compound of the counts beyond a reasonable doubt.

The board recognized this and credited Engelhardt with an actual reduction to practice no later than March 3, 1959, two years and three months prior to his filing date. The board commented as follows in holding that the junior party synthesized and analyzed his compounds and successfully tested their usefulness as drugs:

We have no doubt upon the evidence that Zell under Engelhardt's instructions and supervision produced the compound of Count 1 and its maleic salt according to Count 2 and identified them upon satisfactory experimental

and analytical evidence * * * and sent the maleic salt to the Pharmacological Laboratories for testing. Neither do we have any doubt * * * that the compound was tested for toxicity on mice, and then for antihistamine effect on guinea pigs and for serotonin antagonism by the rats foot edema test, and that the latter tests both showed "effect." * * * All of the work was completed before March 3, 1959. * * *

■ The board recognized that Archer v. Papa, 265 F.2d 954, 46 CCPA 835, holds that successful use of a compound on laboratory animals may be sufficient proof of utility to establish an actual reduction to practice of the compound. However, the board expressed some doubt as to whether or not the instant case is within the Archer v. Papa rule in view of the following reference to dosing humans contained in the Engelhardt specification:

Tests on animals have indicated that the compounds of the invention are useful as antispasmodics and as central stimulants. For this purpose the daily dosage for humans is within the range of 5 mg. to 250 mg., preferably taken in divided amounts over the day in capsule or tablet form. * * *

While resolving doubt on this point of law in favor of Engelhardt, the board awarded priority to Judd on the ground that "the case * * * falls into all fours with Mason v. Hepburn," 13 App. D.C. 86, 1898 C.D. 510. In other words, Engelhardt, although apparently the prior inventor in fact, was considered by the board to have suppressed or concealed his invention; and pursuant to 35 U.S.C. § 102(g), Engelhardt was therefore held to have forfeited his right to an award of priority due to application against him of the principle laid down by the Court of Appeals for the District of Columbia Circuit in the leading case of Mason v. Hepburn nearly seventy years ago.

On reconsideration the board clarified its position on the actual reduction to practice issue as follows:

We do wish to point out that we did not state in the decision that reduction to practice was proven by Engelhardt beyond a reasonable doubt. What we did state was that we had no doubt upon the evidence as to certain facts and that these facts would be sufficient to constitute reduction to practice under Archer v. Papa * * * if we were interpreting that decision correctly. We admitted to at least a doubt on this point. This doubt can only be resolved in the appellate forum. * * *

In view of these statements by the board, appellees make an interesting argument that the lower tribunal could not have held that appellant established an actual reduction to practice beyond a reasonable doubt by virtue of the board's own expression of doubt as to its interpretation of Archer v. Papa, supra.

■ As the "appellate forum" which decided the Archer v. Papa case cited by the board, we resolve the board's doubt by holding that reference to dosing humans in his specification does not preclude an inventor from proving actual reduction to practice of a drug by successful utility testing on standard experimental animals. In the record before us, there is satisfactory evidence of the correlation between antihistamine and antiserotonin activity in laboratory animals and in human beings, as shown by the following unchallenged testimony of witness Stone, Director of Biological Research for Merck, Sharp, & Dohme Research Laboratories:

DQ 41. Do you know whether or not the antiserotonin tests in this Exhibit CC were ever related to activity in humans? A. It is known that MK–141 has antiserotonin effects in man. It has been demonstrated.

DQ 42. Were you or were you not able to expect this activity in man from the activity in animals? A. We would have predicted it, so it would have been surprising had it not occurred.

DQ 43. Could you state the same thing as being true or not true with respect to the probable activity of com-

pound L583232 in man? A. I would expect that that compound would be able to antagonize serotonin in man.

DQ 44. And how about with respect to antihistamine? A. On the same basis, it ought to block the effects of histamine and have some effect in allergic—some allergic conditions in man, and some beneficial effects.

DQ 45. On the basis of these tests in animals, can you state that compound L583232 would have activity in man? A. I would predict that it would.

■ Appellees also argue that the case for Engelhardt is taken out of the Archer v. Papa doctrine because utilities demonstrated in the successful tests relied on to prove an actual reduction to practice, i. e. antihistamine and antiserotonin activity, are not the same as those asserted in the Engelhardt specification (and the Judd patent), namely utility as antispasmodics and central stimulants. Appellees further contend that the utilities are inconsistent with and opposed to each other, but this argument requires us to take judicial notice of asserted "facts" in the Judd brief which we do not believe to be matters of common knowledge. As for the different utilities, a compound may conceivably be useful for many different specific purposes, any one of which may suffice to show practical, substantial utility for a compound of an interference count unlimited as to use. Blicke v. Treves, 241 F.2d 718; 44 CCPA 753, Biel v. Coan, 130 USPQ 241 (Bd.Pat. Int.1960). We think appellees' argument confuses actual reduction to practice with constructive reduction. An actual reduction to practice may be proved regardless of whether or not a patent application constructively reducing the same invention to practice is ever filed, and the actual reduction might serve to invalidate the patent of a subsequent inventor under 35 U.S.C. § 102(g), unless the prior inventor abandoned, suppressed or concealed the invention which he had been first to reduce to practice. We are considering claims to compounds here, so we are not concerned with the fact that, in establish-

ing an actual reduction to practice, Engelhardt successfully demonstrated utility of his compound in animals for somewhat different pharmaceutical purposes than those asserted in his specification.

■ Since we are satisfied that appellant proved beyond a reasonable doubt an actual reduction to practice of a compound of the counts no later than March 3, 1959, we turn to the question of whether Engelhardt's delay of some twenty-seven months in filing a patent application constitutes abandonment, suppression, or concealment of the invention under 35 U.S.C. § 102(g), according to the facts and circumstances of this particular case. Initially we observe that the cases are all in full accord that each case of alleged suppression and concealment must be considered and decided on its own facts. With this in mind, we think the determinative facts in this proceeding are brought out in the following record testimony of appellant Engelhardt:

XQ 67. Did the fact that you saw the Patent No. 2,985,660 have any influence on your decision to file the Application Serial No. 115,910? A. Yes.

XQ 68. Will you describe it in detail? A. Well, we saw that you had prepared the same compound and had an issued patent on it. We realized we had prepared it some time ago and therefore filed an application and copied claims, I believe, to establish our rights.

XQ 69. Do you have any opinion as to what would have happened to the subject matter of your Application Serial No. 115,910 if you hadn't seen the Lakeside Patent No. 2,985,660? A. Well, we had made only the one compound and had not followed this up, and I had no plans for doing this at the time, although one never knows, you might pick this up again when you make other members of the series and find a more interesting member.

To Engelhardt's frank testimony we think it is appropriate to add that he

"might pick this up again" upon acquiring actual knowledge of another's entry into the field, such as knowledge of an issued patent on the same invention as in Mason v. Hepburn, supra, or knowlege of an opponent's commercial adoption of the same invention as in our recent case of Woofter v. Carlson, 54 CCPA ——, 367 F.2d 436, wherein this court applied the forfeiture doctrine of Mason v. Hepburn against the first inventor in fact.

We think the evidence of record clearly establishes that the "one compound" of the series which Engelhardt had actually reduced to practice demonstrated insufficient activity in laboratory animals to warrant, from a commercial standpoint, either further clinical testing or the filing of a patent application for this series of compounds. Since assignee Merck "had not followed this up," and Engelhardt "had no plans for doing this at the time" he saw a copy of the issued Judd patent well over two years after his actual reduction to practice of "one compound" of the series, we think it is somewhat improbable that Engelhardt would "pick this up again" anytime in the reasonably foreseeable future, had it not been for the issuance of the Judd patent. And if "other members of the series" were not made, Engelhardt would, of course, not have found "a more interesting member" than the "one compound" of this series which appellant had successfully tested but laid aside as having insufficient activity in laboratory animals to warrant either the time and expense of clinical testing or the filing of a patent application disclosing and claiming the series of compounds presently in issue as to priority of invention.

■ We recognize that an inventor of a new series of compounds should not be forced to file applications piecemeal on each new member as it is synthesized, identified, and tested for utility. A reasonable amount of time should be allowed for completion of the research project on the whole series of new compounds, and a further reasonable time period should then be allowed for drafting and filing the patent application(s) thereon, without subjecting the prior inventor or his assignee to the risk of forfeiture of valuable patent rights due to alleged concealment or suppression of the invention. However, with reference to the facts of this case, we regard a delay of two years and three months in filing an application to be unreasonable and inexcusable, considering the Engelhardt invention to be only the one compound of the series which he actually synthesized and tested (count 1). To the extent that the invention is regarded as the whole series of compounds disclosed and claimed in his present application and in the Judd patent (count 3),[1] Engelhardt has clearly and unequivocally testified that, at the time of issuance of the Judd patent, over two years after appellant's synthesis of one compound of the series, he "had no plans" for making or testing "other members of the series," some of which might possibly have proved to be "more interesting" than the one compound actually reduced to practice by Engelhardt.

We think it is clear beyond dispute that Engelhardt was spurred into activity by actual knowledge of the issuance of the Judd patent, according to appellant's own testimony. The record further establishes that the one compound of this series reduced to practice by Engelhardt in March 1959 was set aside as having insufficient activity in standard experimental animals to warrant additional study of either that compound or other members of the same series. On the other hand, laboratory animal tests had been sufficiently promising on another closely related series of compounds having the same type of antihistamine and antiserotonin activity, but to a much greater degree, that a patent application was filed to protect the compounds of this closely related series on July 13, 1959, only four months after Engelhardt's reduction to practice of the one compound of the present series which

---

1. Count 3 is broader than count 1 in that "lower alkyl" is recited in place of "methyl." Neither count is limited as to use of the compounds.

he had made and tested for utility prior to issuance of the Judd patent two years later. The Engelhardt patent No. 3,014,911 on the closely related series of compounds used for the same purposes as those of the present invention discloses and claims a compound known as cyproheptadine, which has the same structural formula as the compound of count 1 shown above, except that there is a double bond between the dibenzocycloheptene nucleus and the piperidine ring. The compound in issue here has a saturated bond connecting the two nuclei. In view of the fact that cyproheptadine was demonstrated to have superior antihistamine and antiserotonin activity to that of the compound of count 1 in laboratory animal tests conducted no later than March 1959, cyproheptadine was subjected to further clinical tests on human beings, which proved to be successful, and the compound was subsequently marketed as "PERIACTIN." A patent application was promptly filed in July 1959 to cover cyproheptadine and related members of the same series as well as intermediates in their preparation. This application matured into Engelhardt patent No. 3,014,911, as noted above.

Meanwhile, the compound of count 1, having been successfully tested for antiserotonin and antihistamine activity to establish an actual reduction to practice, was nevertheless laid aside as having insufficient activity, in comparison with cyproheptadine or "PERIACTIN," to warrant the expense of either further research work or the filing of a patent application to protect the compound of count 1 or the homologous series of compounds defined by count 3. We are not particularly impressed by the fact that the structural formula of the one compound of this series which Engelhardt had prepared prior to issuance of the Judd patent was listed in a project status report of February 1961 to the Scientific Operating Committee of assignee Merck by the witness Dr. Sprague, Engelhardt's supervisor. As the board noted, the record is bare of any recommendations to

the Committee by Dr. Sprague concerning this compound, and equally bare of any decision by the Committee concerning the fate of the compound. To the extent that the mere listing of the structural formula of a compound in a report might lead to an inference that Merck did not intend to abandon the compound, we think it is just as reasonable to infer that Merck intended to continue to suppress knowledge of the compound and to conceal it from the public. In fact, we think the latter inference is the more plausible in view of Engelhardt's testimony that, at the time that knowledge of issuance of the Judd patent came to his personal attention in late May or early June 1961, at least three months after the February 1961 Committee meeting, "only the one compound" had been made, the project had not been followed up with respect to the homologous series of compounds priority of invention as to which is presently in issue, and there were "no plans" for following this up at the time Engelhardt became personally aware of the issuance of the patent No. 2,985,660 to Lakeside Laboratories as assignee of senior party Judd.

We think that the evidence of record unquestionably establishes that Engelhardt was spurred into activity by personal knowledge of the issuance of the Judd patent, just as Mason was spurred into activity by personal knowledge of the issuance of the Hepburn patent in the Mason v. Hepburn case, supra. Both Mason and Engelhardt, although being the first to actually reduce their respective inventions to practice, laid aside their inventions and concentrated on other preferred inventions which accomplished the same purposes. Both Mason and Engelhardt took steps to initiate the filing of patent applications on their previously laid aside inventions only after acquiring personal knowledge that other independent inventors, Hepburn and Judd respectively, had made the inventions and had taken positive steps to disclose their inventions to the public, through prosecuting patent applications to issuance of patents. Only after this had occurred

did Mason and Engelhardt come forth to claim patents as against those who already had obtained them. In each case there was no evidence which might lead to a seriously plausible inference that the de facto first inventors, Mason and Engelhardt, would have taken steps in the reasonably foreseeable future to make their inventions available to the public and thus contribute to the progress of the useful arts.

 For these and other reasons, we think Engelhardt's case is remarkably parallel to that of Mason and that the forfeiture doctrine of Mason v. Hepburn was properly applied against the first inventor in fact here. The only material difference between this case and Mason v. Hepburn is that Mason's delay in filing his patent application after his actual reduction to practice was seven years, while Engelhardt's delay in filing was two years and three months. As we pointed out in the recent case of Woofter v. Carlson, supra, 367 F.2d at 443:

> There is no required time period for the loss of right to a patent by suppression of an invention. A suppression if established for a 4 year period is as effective as is one for an 8 year period.

Appellant principally relies on two of this court's cases to sustain his position that there was no suppression or concealment under 35 U.S.C. § 102(g). The following statement is contained in the first of these cases, Rhinevault v. Pfiester, 65 F.2d 161, 164, 20 CCPA 1112, 1117, (1933):

> It is not shown that the first inventor was spurred into Patent Office activity by the actions of the second inventor.

A similar statement is found in the subsequent case of Brown v. Childs, 120 F.2d 350, 352, 28 CCPA 1229, 1232, (1941):

> We find nothing in the record which tends to prove that appellee had any knowledge of the entry of appellant into the field and therefore cannot agree with the contention that appellee was apparently spurred into activity by such knowledge.

In stark contrast to the situations in the Brown v. Childs and Rhinevault v. Pfiester cases, the testimony of Engelhardt quoted above proves beyond a reasonable doubt that appellant was spurred into activity solely by personal knowledge of the issuance of the Judd patent more than two years after Engelhardt had actually reduced to practice one member of the homologous series of compounds in issue.

While recognizing and approving the admonitions of the cases that each case of alleged suppression or concealment must necessarily be determined according to its own facts, and that the courts are reluctant to expand the forfeiture doctrine laid down in Mason v. Hepburn, we think that this case presents a fact situation essentially on all fours with Mason v. Hepburn and that the principle of that precedent should be applied here against appellant Engelhardt. The decision of the board is affirmed.

Affirmed.

MARTIN, J., participated in the hearing of this case but died before a decision was reached.