Owen W. GRIFFITH, Appellant,

v.

Tsuneo KANAMARU, Susumu Shinagawa, and Mitsuko Asai, Appellees.

Appeal No. 87–1042.

United States Court of Appeals, Federal Circuit.

April 8, 1987.

Eric S. Spector of Jones, Tullar & Cooper, P.C., Arlington, Va., argued for appellant.

Harold C. Wegner of Wegner & Bretschneider, Washington, D.C., argued for appellees. With him on brief was Helmuth A. Wegner, of Wegner & Bretschneider, Washington, D.C.; Barry E. Bretschneider and Herbert I. Cantor, of counsel.

Before BISSELL, Circuit Judge, NICHOLS, Senior Circuit Judge, and ARCHER, Circuit Judge.

NICHOLS, Senior Circuit Judge.

Owen W. Griffith (Griffith) appeals the decision of the Board of Patent Appeals and Interferences (board) (Patent Interference No. 101,562) that Griffith failed to establish a *prima facie* case that he is entitled to an award of priority against the filing date of Tsuneo Kanamaru, *et al.* (Kanamaru) for a patent on aminocarnitine compounds. We affirm.

## Background

This patent interference case involves the application of Griffith, an Associate Professor in the Department of Biochemistry at Cornell University Medical College, for a patent on an aminocarnitine compound, useful in the treatment of diabetes, and a patent issued for the same invention to Kanamaru, an employee of Takeda Chemical Industries. The inventors assigned their rights to the inventions to the Cornell Research Foundation, Inc. (Cornell) and to Takeda Chemical Industries respectively. The technology established by this invention is not at issue in this appeal and is therefore not described further.

Griffith had established conception by June 30, 1981, and reduction to practice on January 11, 1984. Kanamaru filed for a United States patent on November 17, 1982. The board found, however, that Griffith failed to establish reasonable diligence for a *prima facie* case of prior invention and issued an order to show cause under 37 C.F.R. § 1.617 as to why summary judgment should not be issued.

The board considered the additional evidence submitted by Griffith pursuant to the show cause order and decided that Griffith failed to establish a *prima facie* case for priority against Kanamaru's filing date. This result was based on the board's conclusion that Griffith's explanation for inactivity between June 15, 1983, and September 13, 1983, failed to provide a legally sufficient excuse to satisfy the "reasonable diligence" requirement of 35 U.S.C. § 102(g). Griffith appeals on the issue of reasonable diligence.

## Analysis

### I

This is a case of first impression and presents the novel circumstances of a university suggesting that it is reasonable for the public to wait for disclosure until the most satisfactory funding arrangements are made. The applicable law is the "reasonable diligence" standard contained in 35 U.S.C. § 102(g) and we must determine the appropriate role of the courts in construing this exception to the ordinary first-in-time rule. The statute states as follows:

A person shall be entitled to a patent unless—

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this

country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

5 U.S.C. § 102(g).

Griffith must establish a *prima facie* case of reasonable diligence, as well as dates of conception and reduction to practice, to avoid summary judgment on the issue of priority. 37 C.F.R. § 1.617(a). As a preliminary matter we note that, although the board focused on the June 1983 to September 1983 lapse in work, and Griffith's reasons for this lapse, Griffith is burdened with establishing a *prima facie* case of reasonable diligence from immediately before Kanamaru's filing date of November 17, 1982, until Griffith's reduction to practice on January 11, 1984. 35 U.S.C. § 102(g); 37 C.F.R. § 1.617(a).

On appeal, Griffith presents two grounds intended to justify his inactivity on the aminocarnitine project between June 15, 1983, and September 13, 1983. The first is that, notwithstanding Cornell University's extraordinary endowment, it is reasonable, and as a policy matter desirable, for Cornell to require Griffith and other research scientists to obtain funding from outside the university. The second reason Griffith presents is that he reasonably waited for Ms. Debora Jenkins to matriculate in the Fall of 1983 to assist with the project. He had promised her she should have that task which she needed to qualify for her degree. We reject these arguments and conclude that Griffith has failed to establish grounds to excuse his inactivity prior to reduction to practice.

## II

The reasonable diligence standard balances the interest in rewarding and encouraging invention with the public's interest in the earliest possible disclosure of innovation. 6 C. Gholz, I. Kayton, D. Conlin & R.

Schwaab, *Patent Practice* 24–9 (1985) citing *Hull v. Davenport,* 90 F.2d 103, 105, 24 CCPA 1194, 1196, 33 USPQ 506, 508 (1937). Griffith must account for the entire period from just before Kanamaru's filing date until his reduction to practice. 3 D. Chisum, *Patents* § 10.07 at 10–120 (1986). As one of our predecessor courts has noted:

Public policy favors the early disclosure of inventions. This underlies the requirement for "reasonable diligence" in reducing an invention to practice, not unlike the requirement that, to avoid a holding of suppression or concealment, there be no unreasonable delay in filing an application once there has been a reduction to practice.

*Naber v. Cricchi,* 567 F.2d 382, 385 n. 5, 196 USPQ 294, 297 n. 5 (CCPA 1977), *cert. denied,* 439 U.S. 826, 99 S.Ct. 98, 58 L.Ed.2d 119 (1978) (citation omitted).

The board in this case was, but not properly, asked to pass judgment on the reasonableness of Cornell's policy regarding outside funding of research. The correct inquiry is rather whether it is reasonable for Cornell to require the public to wait for the innovation, given the well settled policy in favor of early disclosure. As the board notes, Chief Judge Markey has called early public disclosure the "linchpin of the patent system." *Horwath v. Lee,* 564 F.2d 948, 950, 195 USPQ 701, 703 (CCPA 1977). A review of caselaw on excuses for inactivity in reduction to practice reveals a common thread that courts may consider the reasonable everyday problems and limitations encountered by an inventor. *See, e.g., Bey v. Kollonitsch,* 806 F.2d 1024, 231 USPQ 967 (Fed.Cir.1986) (delay in filing excused where attorney worked on a group of related applications and other applications contributed substantially to the preparation of Bey's application); *Reed v. Tornqvist,* 436 F.2d 501, 168 USPQ 462 (CCPA 1971) (concluding it is not unreasonable for inventor to delay completing a patent application until after returning from a three week vacation in Sweden, extended by illness of inventor's father); *Keizer v. Bradley,* 270 F.2d 396, 47 CCPA 709, 123 USPQ 215 (1959) (delay excused where inventor, after

producing a component for a color television, delayed filing to produce an appropriate receiver for testing the component); *Courson v. O'Connor*, 227 F. 890, 894 (7th Cir.1915) ("exercise of reasonable diligence * * * does not require an inventor to devote his entire time thereto, or to abandon his ordinary means of livelihood"); *De Wallace v. Scott*, 15 App.D.C. 157 (1899) (where applicant made *bona fide* attempts to perfect his invention, applicant's poor health, responsibility to feed his family, and daily job demands excused his delay in reducing his invention to practice); *Texas Co. v. Globe Oil & Refining Co.*, 112 F.Supp. 455, 98 USPQ 312 (N.D.Ill.1953) (delay in filing application excused because of confusion relating to war).

■ Griffith argues that the admitted inactivity of three months between June 15, 1983, and September 13, 1983, which he attributes to Cornell's "reasonable" policy requiring outside funding and to Griffith's "reasonable" decision to delay until a graduate student arrived, falls within legal precedent excusing inactivity in the diligence context. We disagree. We first note that, in regard to waiting for a graduate student, Griffith does not even suggest that he faced a genuine shortage of personnel. He does not suggest that Ms. Jenkins was the *only* person capable of carrying on with the aminocarnitine experiment. We can see no application of precedent to suggest that the convenience of the timing of the semester schedule justifies a three-month delay for the purpose of reasonable diligence. Neither do we believe that this excuse, absent even a suggestion by Griffith that Jenkins was uniquely qualified to do his research, is reasonable.

■ Griffith's second contention that it was reasonable for Cornell to require outside funding, therefore causing a delay in order to apply for such funds, is also insufficient to excuse his inactivity. The crux of Griffith's argument is that outside funding is desirable as a form of peer review, or monitoring of the worthiness of a given project. He also suggests that, as a policy matter, universities should not be treated as businesses, which ultimately would de-

tract from scholarly inquiry. Griffith states that these considerations, if accepted as valid, would fit within the scope of the caselaw excusing inactivity for "reasonable" delays in reduction to practice and filing.

These contentions on delay do not fit within the texture and scope of the precedent cited by the parties or discussed in this opinion. Griffith argues this case is controlled by the outcome of *Litchfield v. Eigen*, 535 F.2d 72, 190 USPQ 113 (CCPA 1976). We disagree. In *Litchfield*, Judge Rich held that the inventors failed to establish due diligence because of their inactivity between April 1964 and September 1965. *Id.* at 76–77, 190 USPQ at 116. The court based this conclusion on the finding that the inventors possessed the capacity to test the invention and chose instead to test other compounds. *Id.* Judge Rich did not reach the issue of the alleged budgetary limitations imposed by the sponsor and stated that the inventors failed to show any evidence of such financial limitations and that, therefore, the court could not consider this contention. *Id.*

Griffith's excuses sound more in the nature of commercial development, not accepted as an excuse for delay, than the "hardship" cases most commonly found and discussed *supra*. Delays in reduction to practice caused by an inventor's efforts to refine an invention to the most marketable and profitable form have not been accepted as sufficient excuses for inactivity. D. Chisum, *Patents* § 10.07[2] at 10–122 & n. 4 (1986) (citations omitted). Griffith's case is analogous to that in *Seeberger v. Dodge*, 24 App.D.C. 476 (1905). In that case, the inventor was the first to conceive of an improvement in an escalator and was attempting to show diligence. The court noted:

The testimony shows that he [Seeberger] was a man of means, and might have constructed an escalator had he undertaken to do so. Instead of this, his constant effort was to organize corporations, or to interest capital in other ways,

for the purpose of engaging in the general manufacture of escalators.

*Id.* at 484–85.

The court held this unacceptable:

> One having the first complete conception of an invention cannot hold the field against all comers by diligent efforts, merely, to organize and procure sufficient capital to engage in the manufacture of his device or mechanism for commercial purposes. This is a different thing from diligence in actual reduction to practice.

*Id.* at 485 (citation omitted).

The comparison we draw is that Cornell University, like Seeberger, has made a clear decision against funding Griffith's project in order to avoid the risks and distractions, albeit different in each case, that would result from directly financing these inventions. Griffith has placed in the record, and relies on, an able article by President Bok of Harvard, *Business and the Academy, Harvard Magazine,* May-June 1981, 31, App. at 81. Bok is explaining the policy issues respecting academic funding of scientific research, for the benefit of Harvard's alumni who must, of course, make up by their contributions the University's annual deficit. While much academic research could produce a profit, pursuit of such profit may be business inappropriate for a university though it would be right and proper for a commercial organization. For example, it might produce conflicts between the roles of scientists as inventors and developers against their roles as members of the university faculty. However large the university's endowment may be, it may be better to enlist private funding and let this source of funds develop the commercial utilization of any invention as perhaps, the beneficial owner. If there is a patent, the source of funds may end up assignee of the patent. It seems also implicit in this policy choice that faculty members may not be allowed single-minded pursuit of reduction to practice whenever they conceive some idea of value, and at times the rights of other inventors may obtain a priority that a single-minded pursuit would have averted.

Bok says diligent reduction to practice, to satisfy the patent laws, may interfere with a faculty member's other duties. Bok is asking the approval of his alumni, not of the courts. The management of great universities is one thing, at least, the courts have not taken over and do not deem themselves qualified to undertake. Bok does not ask that the patent laws or other intellectual property law be skewed or slanted to enable the university to have its cake and eat it too, *i.e.,* to act in a noncommercial manner and yet preserve the pecuniary rewards of commercial exploitation for itself.

If, as we are asked to assume, Cornell also follows the policy Bok has so well articulated, it seems evident that Cornell has consciously chosen to assume the risk that priority in the invention might be lost to an outside inventor, yet, having chosen a noncommercial policy, it asks us to save it the property that would have inured to it if it had acted in single-minded pursuit of gain.

## III

The board in this case considered primarily Griffith's contention that the Cornell policy was reasonable and therefore acceptable to excuse his delay in reduction to practice. Although we agree with the board's conclusion, it is appropriate to go further and consider other circumstances as they apply to the reasonable diligence analysis of 35 U.S.C. § 102(g). The record reveals that from the relevant period of November 17, 1982 (Kanamaru's filing date), to September 13, 1983 (when Griffith renewed his efforts towards reduction to practice), Griffith interrupted and often put aside the aminocarnitine project to work on other experiments. Between June 1982 and June 1983 Griffith admits that, at the request of the chairman of his department, he was primarily engaged in an unrelated research project on mitochondrial glutathione metabolism. Griffith also put aside the aminocarnitine experiment to work on a grant proposal on an unrelated project. Griffith's statement in the record that his unrelated grant application, if granted,

might "support" a future grant request directed to the aminocarnitine project does not overcome the conclusion that he preferred one project over another and was not "continuously" or "reasonably" diligent. Griffith made only minimal efforts to secure funding directly for the aminocarnitine project.

The conclusion we reach from the record is that the aminocarnitine project was second and often third priority in laboratory research as well as the solicitation of funds. We agree that Griffith failed to establish a *prima facie* case of reasonable diligence or a legally sufficient excuse for inactivity to establish priority over Kanamaru.

### Conclusion

Griffith has failed to establish a *prima facie* case of "reasonable diligence" to establish grounds for the award of priority as against Kanamaru's filing date.

AFFIRMED.