54 CCPA

**Richard J. CLAUSS and Henry Brown, Appellants,**

v.

**Donald Gardner FOULKE, Otto Kardos and Herman Koretzky, Appellees.**

**Patent Appeal No. 7683.**

United States Court of Customs and Patent Appeals.

June 22, 1967.

Harness, Dickey & Pierce, Neal A. Waldrop, Detroit, Mich. (Sidney Wallenstein, Chicago, Ill., and Albert C. Martin, Grosse Ile, Mich., of counsel), for appellants.

Pennie, Edmonds, Morton, Taylor & Adams, New York City (James W. Laist, Robert J. Kadel, New York City, Carl G. Seutter, New York City, Charles N. Shane, Jr., Washington, D. C., of counsel), for appellees.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

WORLEY, Chief Judge.

Clauss and Brown [1] appeal from the decision of the Board of Patent Inter-

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Clauss and Brown (hereafter Clauss) are involved on their application Serial No. 16,176, filed March 21, 1960.

ferences awarding priority of invention to the senior party, Foulke, Kardos and Koretzky,[2] of a process for producing bright nickel deposits from an electroplating bath, as reflected in the only count:

1. The process for producing bright nickel deposits which comprises electrodepositing nickel from an aqueous solution of at least one nickel salt characterized in that there is dissolved in the nickel plating bath at least about 1 millimole per liter of a compound of the formula

$$R_1-O-CH_2-C \equiv C-CH_2-O-R_2$$

wherein $R_1$ is a radical selected from the group consisting of

$$-H, \quad -CH_2-\overset{\overset{\displaystyle OH}{|}}{CH}-CH_2Cl, \quad -C_2H_4OH$$

and $-CH_2-\overset{\overset{\displaystyle CH_3}{|}}{CHOH}$ and $R_2$ is a radical selected from the group consisting of

$$-CH_2-\overset{\overset{\displaystyle OH}{|}}{CH}-CH_2Cl, \quad -C_2H_4OH \quad \text{and}$$

$-CH_2-\overset{\overset{\displaystyle CH_3}{|}}{CHOH}$ and sodium allyl sulfonate in an amount of at least about 0.3 grams/liter.

The novelty in the electrodeposition process resides in the use of a combination of "at least about 0.3 grams/liter" of sodium allyl sulfonate (SAS) and "at least about 1 millimole per liter" of a particular derivative of 2-butyne-1,4-diol[3] as a brightening agent whereby a bright nickel deposit is produced, in contrast to the dull or matte surface appearance resulting from electrodeposi-

tion of nickel in the absence of a brightening agent.

■ Foulke took no testimony and is accordingly restricted to his filing date for conception and constructive reduction to practice. The principal issue before us is whether Clauss has proved by a preponderance of the evidence that he reduced the invention to practice by actually carrying out the process of the count prior to Foulke's filing date. Subsidiary questions related to that issue are whether the evidence establishes (1) that Clauss used, and knew he used, a butynediol-ethylene oxide adduct in the quantity required by the count as the active material to produce bright nickel, and (2) that the results of certain laboratory tests carried out on behalf of Clauss were satisfactory. The board found the testimony, documentary evidence, and physical exhibits introduced by Clauss, *relating to activity occurring in 1955 and 1957, to be insufficient to prove actual reduction at those times,* principally because it regarded the test results of Clauss to be unsatisfactory.

It appears from the record that Dr. Brown, director of research at Udylite Corp. and coinventor with Clauss, had for some time been interested in the use of unsaturated compounds as brightening agents for nickel plating and, in 1955, had tested 2-butyne-1,4-diol for that purpose. On June 21, 1955, he wrote *Dr. Duggins of the Commercial Development Department of General Aniline and Film Corp. (GAF)*, stating in part (Exhibit 25):

\* \* \* \* \* \*

The 2-butyne-1,4-diol looks very good for us, but we would prefer it with 1 mole of ethylene oxide added to it, as we need the oxide group. Could you

2. Foulke, Kardos and Koretzky (hereafter Foulke) are involved on their application Serial No. 750,258, filed July 22, 1958.

3. 2-butyne-1, 4-diol ($HOCH_2-C\equiv C-CH_2OH$) itself is an acknowledged nickel brightening agent in the prior art. The particular derivatives of 2-butyne-1,4-diol

called for by the count which will be of interest here are its mono- and di-ethylene oxide adducts, $HOCH_2-C\equiv C-CH_2OC_2H_4OH$ and $HOC_2H_4OCH_2-C\equiv C-CH_2OC_2H_4OH$, respectively. One millimole of the mono- and di- adducts is equivalent to 130 and 174 milligrams, respectively.

do this for us on a 1 lb sample? We would gladly pay the costs as we be-lieve that this would be just exactly what we need. i. e.

$$C\text{---}CH_2OC_2H_4OH$$
$$|||$$
$$C\text{---}CH_2OH$$

or mixed with

$$C\text{---}CH_2OC_2H_4OH$$
$$|||$$
$$C\text{---}CH_2OC_2H_4OH$$

\* \* \* \* \* \* \* \* \* \* \* \*

———◆———

Shortly thereafter, in apparent response, Duggins sent Brown a sample of material in a bottle labelled simply

1,4 Butynediol + Ethylene Oxide
Mole Ratio 1.79:1
High Pressure Run No. 314D

That bottle, still containing a portion of dark brown liquid, is in evidence as Clauss Exhibit 1.

Lillie Tomaszewski, holder of a Master of Science degree in chemistry, testified that Clauss gave her the bottle identified as Exhibit 1 on July 1, 1955, and also gave her an outline to follow in employing the contents of the bottle in nickel plating baths in conjunction with various other brighteners, including sodium allyl sulfonate (SAS).[4] Her testimony is conceded to establish that from July 1–8, 1955 and again in August 1957 she plated a number of polished steel test strips in various nickel plating baths to which varying amounts of SAS and material from Exhibit 1 were added. The procedures she utilized and the results that were obtained were recorded in a laboratory notebook, pages of which are in evidence as Exhibits 47–52 and 54–57. Some thirteen individual tests of Tomaszewski, denoted by the parties in their briefs as panels 2, 3, 6; 7, 9, 10, 19, 21, 23, 27 and 28 produced in July 1955, and panels 60 and 62 produced in August 1957, are relied on by Clauss for reduction to practice. Five test panels produced on August 2, 1957, two of which are panels 60 and 62, are in evidence as Exhibits 58–62.

Clauss testified that he inspected the panels produced by Tomaszewski in July 1955 and wrote Brown a report, dated July 8, 1955, and titled "Use of Ethylene Oxide Ether of 1,4 Butyne-diol in Nickel Electroplating Solutions," which reads in part:

A sample of the ethylene oxide ether of 1,4 butyne-diol was received from General Aniline and Film Corp. on June 28, 1955 and tested on that day. This sample (Run No. 314D) had a molar ratio of 1.79:1.

This material has been found to be effective in watts nickel plating solutions when used with No. 3 or No. 4 ["No. 4" is Udylite's designation of SAS] or various combinations of those brighteners. When so used, it is possible to obtain fully bright ductile deposits with good leveling. The concentration of the ethylene oxide ether of the butyne-diol may vary from .1 to .30 g/l.

\* \* \* \* \* \*

The original report is in evidence as Exhibit 30; Clauss' handwritten and typed copies of that report are in evidence as Exhibits 65 and 66; and Tomaszewski's carbon copy is in evidence as Exhibit 53. Clauss stated that his report to Brown was in part based on tests he himself had carried out with the material in Exhibit 1. Those tests are not part of the present record.

Brown testified that he also examined the panels made by Tomaszewski. He wrote a letter (Exhibit 27) to Duggins on July 1, 1955, reporting to him that the 1.79/1 mole ratio in Exhibit 1 "does not quite give the right results" and that the "1:1 ratio may work." He

---

4. The parties agree that Tomaszewski employed the amount of SAS required by the count in all experiments on which Clauss relies for actual reduction to practice.

wrote Duggins again (Exhibit 28) on July 5, 1955, stating that the material of Exhibit 1

> * * * is closer to our possible commercial use than we first thought, because there is apparently an impurity in the dark brown product causing some trouble. On purification of the material we are obtaining better results.
>
> The 1 mole ethylene oxide addition to the 1 mole of 2-butyne-1,4-diol may definitely be the commercial answer for us, and we are looking forward to this sample. * * *[5]

The "purification" to which Brown refers evidently was the treatment by Tomaszewski of a portion of the material in Exhibit 1 with activated carbon black. The remains of that carbon-treated material is in evidence as Exhibit 18. While the record shows that GAF later sent to Brown samples containing the reaction product of 1 mole of ethylene oxide and 1 mole 2-butyne-1,4-diol, no experimental results from the use of that material were submitted in evidence.

A short history of how the contents of Exhibit 1 came to be produced and analyzed is also pertinent to the issues involved in this appeal. It appears from the record that a Dr. Brusie, group leader of GAF's high pressure laboratory and a person knowledgeable in reactions of acetylene compounds, received a request for preparation of "bis-β-hydroxy-ethylether of 1,4-butynediol ($HOCH_2 CH_2OCH_2C \equiv C\ CH_2OCH_2CH_2OH$)." The request was made by Duggins in October 1954 at the behest of another party who believed the compound would yield "a valuable polyester resin." Subsequently, in January 1955, Brusie and his coworkers carried out a high pressure reaction, run No. 314D, between 2-butyne-1,4-diol and ethylene oxide in the presence of sodium hydroxide as a catalyst in response to that request. Brusie testified that, to his knowledge, it was the first time a reaction between those compounds had been attempted and he didn't know what product or products he would get when the reaction was carried out. He also testified that he did not have the material resulting from the reaction analyzed to determine what products were produced. Several bottles of the crude reaction product were sent to the Commercial Development Department of GAF. A portion of that crude reaction product ultimately became the material sent by Duggins to Brown in June 1955, Exhibit 1 herein.

When Brown received Exhibit 1, both he and Clauss proceeded with subsequent experimentation in nickel plating on the assumption that Exhibit 1 contained 100% "active material," i. e. "the ethylene oxide adduct of butynediol." The amounts of adduct from Exhibit 1 which Tomaszewski reported in her notebooks that she used in her 1955 and 1957 laboratory experiments, and the amounts of "ethylene oxide ether of the butynediol" which Clauss states in Exhibits 30, 53, 65 and 66 were used, all appear to be predicated on that assumption. Indeed, Brown testified that the exemplary amounts recited as useful in their 1960 patent application in the present interference were also premised on that assumption. The record shows that Brown, Clauss or Tomaszewski did not attempt analysis of Exhibit 1 to determine what products, or how much of each, were present, at least in 1955–1957.[6]

5. Contrary to the position of the board, Duggins did corroborate receiving each of those letters written by Brown, viz. Exhibits 25, 27 and 28, in his testimony with respect to Exhibit 7.

6. Brown and Tomaszewski each testified to the effect that they depended upon an examination of the test panels to tell them whether they had placed too much, or too little, brightener material from Exhibit 1 in the plating bath. If too much brightener were in the bath, "skipping" (failure of nickel to deposit at all in low current density areas) would occur, and the bath concentration would be diluted accordingly. According to Brown, there would be an "upper limit," or "optimum amount" or range, at which addition of further brightener did not improve brightness but did induce "skipping."

Later events proved the assumption of Clauss and Brown as to how much ethylene oxide adduct of butynediol was present in Exhibit 1 to be in fact erroneous. In 1964, over two years *after* the interference was declared, the contents of Exhibit 1 *were* subjected to qualitative and quantitative analysis by Dr. Stolten, head of the analytical department of GAF's central research laboratory. Stolten compared the infra-red (IR) spectrum and vapor-phase chromatograph of the contents of Exhibit 1 with a "reference" spectrum and chromatograph of a sample of commercial "bishydroxy-ethyl ether butynediol" produced by GAF in 1962. He found the IR spectrum of Exhibit 1 to be "consistent with the structure of bis-hydroxy-ethyl ether butynediol." He "definitely" found no evidence of any monoethoxylated butynediol in the IR spectrum of either the commercial material or Exhibit 1, stating that if the unsymmetrical mono-adduct were there it would "absorb quite intensely between 4 and 5 microns." On the basis of the gas chromatograph analysis, Stolten calculated the amount of di-adduct present to be $54\pm5\%$. To account for the remaining 46%, he testified that he also found amounts of unreacted butynediol, ethylene glycol, diethylene glycol, triethylene glycol and unknown material in the sample taken from Exhibit 1. One month later, Dr. Stolten testified to performing additional investigation with the sample from Exhibit 1, and concluded, as a result of certain assumptions, that $14\pm5\%$ of the sample might be the mono-adduct. At that time he also analyzed the carbon-treated material of Exhibit 18, and found it to contain $55\pm5\%$ di-adduct and $18\pm5\%$ mono-adduct. He stated that he could have isolated the material he was assuming to be mono-adduct in order to definitely determine its structure, but "I have not been asked to do this."

In its decision, the board stated that "we do not find it necessary to consider either the evidence [of Clauss] or the arguments [of Foulke] relative" to whether Clauss or Brown knew at the time the nickel plating tests were made in 1955 and 1957 what specific active materials, or how much of them, were in the composition of Exhibit 1, reasoning:

* * * The record before us establishes that one of the joint inventors, Henry Brown, requested of General Aniline and Film Corporation through its agent, William Duggins, to be supplied with ethoxylated butynediol, the 1 and 2 mole adducts thereof. Duggins testified that he supplied Brown with such a sample as was requested * * *. Duggins further identified the bottle labelled "1,4 Butynediol & Ethylene Oxide Mole Ratio 1.79:1 High Pressure Run No. 314D" (Exhibit 1) as a sample of ethoxylated butynediol [7] produced by General Aniline and Film Corporation * * *. In view of the foregoing we do not feel that it should be necessary for the party Clauss et al. to establish the identity of the adduct received from the General Aniline and Film Corporation. Even though the sample of the adduct was not specifically labelled as such or represented a product produced commercially, it nonetheless was shipped in the course of business by a reputable manufacturer to fill a specific request, and there seems to be little likelihood that the bottle sent (Exhibit 1) did not contain what the manufacturer believed to be the substance requested and so indicated on the label of the bottle; that is the addition product of 1.79 moles of ethylene oxide and one mole of 2-butyne-1,4-diol. In an analogous situation the Court of Customs and Patent Appeals held that the analysis or testing of a material obtained from an independent manufacturer may not be necessary and may be presumed to be what it is purported to be; Young et al. v. Bullitt, 43 CCPA 932, 233 F.2d 347, * * *

7. Duggins also testified that the expression "ethoxylated butynediol" is a generic term "for any reaction product which you might get by reacting * * * ethylene oxide with 2-butyne-1,4-diol."

110 USPQ 55. Furthermore the fact that the label of the sample bottle is not specific with respect to a reaction product or an adduct is not seen to be material in that the testimony of Duggins is deemed to be sufficient to establish that the marking of the label signifies the ethylene oxide, butynediol adduct. As in the Young et al. v. Bullitt case, supra, the presumption that the sample of the adduct is in fact the ethylene oxide, butynediol reaction product of the count has not been rebutted by any evidence in conflict therewith. * * *

\* \* \* \* \* \*

The fact that the inventors had knowledge of the contents of the bottle identified as Exhibit 1 is further corroborated by Tomaszewski who testified that she received a copy of the report of her work sent to Brown by Clauss. The report (Exhibit 30) was identified by her, and her copy was also introduced into evidence as Exhibit 53. The report refers to Run No. 314D having a molar ratio of 1.79:1 and indicates it to be the ethylene oxide ether of 1,4-butynediol.

The board further held that the term "about" in the count expression "at least about 1 millimole per liter of a compound" of the depicted formula appearing in the count "must be construed broadly," since the Foulke and Clauss applications contemplate the use of 0.1 to 250 and 0.29 to 1.44 millimoles per liter, respectively.[8] The board thus found that at least some of the tests performed by Tomaszewski used the amount of adduct required by the count.

However, the board stated:

Notwithstanding the fact that Tomaszewski did carry out plating procedures under the direction of Clauss which meet the limitations of the count in interference, it is our opinion that Clauss et al. have not established by a preponderance of the evidence a successful reduction to practice. After review of the record we do not feel that it adequately establishes that the inventors were able to obtain consistent or reproducible results in the tests conducted in their behalf. * * *

It found that many of the test panels produced by Tomaszewski, although described by her in her notebook as evincing a bright nickel deposit, were also subject to such defects as "skipping" (areas of no plating), "edge hardness" and "brittleness," as shown by the written comments of Tomaszewski in her laboratory notebook. That appraisal, together with the failure of Clauss to file a patent application shortly after the 1955 or 1957 tests, indicated to the board "that the inventors were not entirely satisfied with the results of the tests," and priority was awarded to Foulke.

Under the view we take of this case, it is unnecessary to consider whether, as Clauss contends, the board erred in holding that Tomaszewski's 1955 and 1957 test results were not consistent or reproducible; or whether it overlooked the fact that bright nickel was produced in every test where SAS and the material in Exhibits 1 and 18 were employed; or whether it "magnified" the factors of edge hardness, brittleness and skipping "out of all sense of reality," in direct conflict with testimony said to show the

8. Actually, the Foulke application discloses the use, "in general," of 0.1 to 250 millimoles/liter of the *"reaction product"* of an "alkynol" and "epoxide," an expression far broader in scope than the specific ethylene oxide mono- or di-adduct of 2-butyne-1,4-diol individually mentioned in the count. With respect to the latter compound, Foulke discloses the use of 2-butyne-1,5-diol individually mentioned 0.4 gram/liter (or about 2.3 milli-moles/liter), and original claim 10 calls for the use of "from about 1 to about 100 millimoles per liter" of the ethylene oxide diadduct of the count.

While Clauss does disclose the use of 0.29 to 1.44 millimole/liter of the di-adduct of the count, he actually employed approximately half that quantity in his experimental work, as will appear hereinafter.

immateriality of those factors for many plating uses. Rather, we shall consider other matters to which our attention has been directed by the briefs—matters relating in general to the *identity* and *quantity* of active material in Exhibits 1 and 18 which Tomaszewski employed in her 1955 and 1957 experiments.

Before discussing those aspects of the case, we shall dispose of a preliminary argument advanced by Clauss. He urges that the board erred in disregarding the *mono-adduct* content he alleges is present in Exhibits 1 and 18 and considering only the *di-adduct* content in determining whether "at least about 1 millimole per liter" of a compound designated by the count was employed by Tomaszewski. It is his position that the "common sense of the situation" dictates that the two components allegedly present in those Exhibits—both mono-adduct and di-adduct—be added together if necessary to meet the quantity requirement recited in the count.

We do not agree with Clauss. In our view, Clauss has not established by a preponderance of the evidence that the mono-ethylene oxide-adduct of butyendiol *is actually present* in either Exhibit 1 or Exhibit 18. It will be recalled that Stolten initially testified that *no* monoadduct was present in Exhibit 1, based on the fact he found no absorption in the IR spectrum for that unsymmetrical compound. Only later did he testify, somewhat equivocally we think, that there appeared to be 14–18% of monoadduct in those Exhibits. No explanation in the record reconciles the conflict between his later testimony and his earlier, more definite statements, predicated on the lack of absorption in the 4–5 micron range of the IR spectrum,

that there is no mono-adduct in Exhibit 1 or 18.

■ Nor do we think that the board erred in failing to consider any monoadduct that might be present in those exhibits in ascertaining whether "at least about 1 millimole per liter of *a* compound" of the designated formula in the count was employed by Tomaszewski. The language of the count clearly calls for the use of *a* compound in the nickel plating process—it does not recite the use of *at least one* compound, or the use of *mixtures* of compounds. Nor does it permit addition of amounts of two or more compounds to obtain the required amount. The construction of the count language urged by Clauss is in derogation of what we understand has been the uniform practice in the Patent Office for many years in the interpretation of similar claim language.[9] We see no valid reason to depart from that practice here. Consequently, we shall be concerned in further discussion only with the di-adduct material in Exhibits 1 and 18.

■ Foulke does not controvert the fact that Tomaszewski, under Clauss' direction, used the contents of Exhibit 1 in her plating experiments appearing in the record, nor does he controvert that Exhibit 1 does contain $54\pm5\%$ of the di-adduct material, as determined by Stolten's 1964 analysis. Rather, Foulke contends[10] that Clauss or Brown *could not* have known *how much* di-adduct was being employed in the plating experiments carried out in 1955 and 1957 or even whether the di-adduct in combination with SAS was the agent responsible for production of bright nickel, inasmuch as Clauss, Brown and Tomaszewski all testified they had not analyzed

---

9. See, for example, 28 JPOS 852 (1946); 37 JPOS 164 (1955). That Clauss was aware of appropriate claim language to achieve the purpose he seeks here is evident from original claim 10 of his application which recites the use in nickel plating of "at least one unsaturated compound represented" by a formula corresponding to that of the count. Clauss

did not move to amend the language of the count defining the issue.

10. As the winning party below, Foulke is not required to cross appeal with respect to issues raised by them before the board and decided adversely to them. See Klemperer v. Price, 271 F.2d 743, 47 CCPA 729.

the contents of Exhibit 1 or 18 and GAF, the supplier, did not itself know or represent to Clauss how much di-adduct, or any other product, was in Exhibit 1.

The board stated that it did not find it necessary to consider the evidence or arguments relating to that issue. The reasons it gives for that conclusion do not go to the crux of the issue posed by Foulke, for even were Clauss justified in assuming that di-adduct material was in Exhibits 1 and 18, a question we need not here decide, the question remains whether Clauss knew *how much* active material was in those exhibits, and what that bright nickel-producing active material was, at any time prior to Foulke's filing date.

■■■■ We must agree with Foulke that Clauss has not proved by a preponderance of the evidence that he or Brown knew, at a time prior to Foulke's filing date, whether an *amount* of di-adduct sufficient to satisfy the requirement of the count was employed by Tomaszewski in her plating experiments. True it is that, based on their assumption that Exhibits 1 and 18 contained 100% active material, they might also have assumed they were using di-adduct in amounts greater than 1 millimole/liter. But an *assumption is all that was*, and an erroneous one at that, as Stolten's 1964 analyses bear out. The fact that the *estimated amounts of di-adduct stated in their 1960 application to be useful*—.05 to .25 gram/liter, or .28 to 1.44 millimole/liter—admittedly turned out to be nearly twice the actual amounts [11] of di-adduct used by them is rather stark evidence that *neither Clauss nor Brown knew prior to Foulke's filing date how much di-adduct was employed in Tomaszewski's tests.* Whether Tomaszewski's experiments did or did not come within the numerical limitation of the count,

such fact was admittedly not known until 1964, the time of Stolten's analysis. We think it is well settled that the patent law does not recognize reduction to practice *nunc pro tunc.* See Heard v. Burton, 333 F.2d 239, 51 CCPA 1502; compare Gianladis v. Kass, 324 F.2d 322, 51 CCPA 753, at footnote 7.

■■ We think Clauss' proofs must fail for yet another reason. Whatever initial presumption there might have been that the material of Exhibit 1 was in fact 100% of a product recited in the count has been amply rebutted by Stolten's 1964 analyses to the effect that Exhibits 1 and 18 contain many other known (including a small amount of 2-butyne-1,4-diol, itself a prior art brightener) and *unknown* materials, any one or combination of which, it would seem, could itself have been at least partially, if not totally, responsible for production of bright nickel. In Vandenberg v. Reynolds, 268 F.2d 744, 46 CCPA 938, the count in issue related to polymerization of chemical compounds in the presence of a specific catalyst, termed PCH. The appellants used as a catalyst a reaction product which contained some of the catalyst required by the count, as well as other materials which might have acted as catalysts. We quoted from the board's opinion:

No competent evidence by Vandenberg has been adduced to satisfactorily establish that the particular hydroperoxide, the inventive feature of the count, was the polymerization catalyst, bearing in mind that it was the entire liquid reaction mass which was used as the catalyst, and that four hydroperoxides of phenyl cyclohexane are theoretically possible. No evidence whatsoever has been introduced to demonstrate that other than the catalyst liquid reaction mass as a whole

---

11. Clauss does not seriously contend here that the experiments carried out on his behalf employed quantities of Exhibit 1 or 18 greater than 0.25 gram/liter, an amount corresponding to 0.78–0.79 millimole of di-adduct per liter based on Stolten's analysis that those exhibits contain 54 and 55% di-adduct, respectively. Whether Tomaszewski employed even that much material from those exhibits is the subject of much debate in the briefs. It is a point unnecessary to dwell on at length here.

promoted the superior results stated to have been obtained by PCH.

The court concluded:

> We entirely agree. Vandenberg has not sustained his burden of proof. It may very well be that PCH was in fact acting as the catalyst, to the exclusion of anything else in the composition, whatever it contained, but the proofs have not established that with the degree of certainty required in cases of this kind. * * *
>
> *   *   *   *   *   *
>
> The material being tested as a catalyst here was not PCH. While it may have been present, it cannot have been known with a reasonable degree of certainty that it was responsible for whatever catalysis was produced (and we have assumed, arguendo, that there was such) considering the other possible catalysts which might have been present in the mixture. It was incumbent on Vandenberg to eliminate such other possibilities in order to establish the effectiveness of PCH as a catalyst.

Here too, the proof of effectiveness of the combination of SAS and di-ethylene oxide adduct of 2-butyne-1,4-diol alone as a nickel brightener must be found deficient in view of the fact the evidence introduced shows it to have been used only in admixture with substantial quantities of other materials, both known and unknown.

While the above observation disposes of all panels relied on, it is particularly true of certain panels and test results relied on by Clauss. It appears from the record and Clauss' brief that Tomaszewski prepared panels 19, 21, 60 and 62 by placing amounts of Exhibit 1 in nickel plating baths *already containing* quantities of other Udylite commercial brighteners.[12] We do not think the use of SAS and quantities or Exhibit 1 in plating baths containing other commercial

nickel brightener materials necessarily establishes that the di-adduct—SAS combination itself produced a bright nickel.

Our review of the record in light of Clauss' contentions satisfies us that the board did not err in awarding priority to Foulke. The decision is affirmed.

Affirmed.

---

12. Panels 19 and 21, for example, were plated with SAS—containing "514" solution (which also contains Udylite brighteners "#5" and "#1RL" and produces bright nickel without additional brighteners being added) to which an amount of Exhibit 1 was added.