58 CCPA
**Hugh Wilma Boulton REED and Alan John Wilkinson, Appellants,**

v.

**Erik TORNQVIST and Arthur W. Langer, Jr., Appellees.**

**Patent Appeal No. 8383.**

United States Court of Customs and Patent Appeals.

Jan. 21, 1971.

---

**502**

Paul N. Kokulis, Cushman, Darby & Cushman, Washington, D. C., attorney of record, for appellants; William T. Bullinger, Washington, D. C., of counsel.

Harold Einhorn, Whelan, Chasan, Litton, Marx & Wright, Linden, N. J., Marvin C. Soffen, Marc S. Gross, New York City, for appellees; Ostrolenk, Faber, Gerb & Soffen, New York City, of counsel.

Before RICH, ALMOND, BALDWIN, and LANE, Judges, and RE, Judge, United States Customs Court, sitting by designation.

BALDWIN, Judge.

This is an appeal from the decision of the Patent Office Board of Interferences awarding priority in Interference No. 94,170 to the appellees, Tornqvist and Langer.

The subject matter involved might be said to be an improved variety of the so-called "Ziegler-type" catalysts, used for the polymerization of olefins. Counts 1–4 on appeal recite the process for preparing the catalyst, while counts 5–7 are drawn to the catalyst itself. Both parties consider count 1 to be typical [paragraphing ours]:

1. The process for preparing a polymerization catalyst comprising the steps of

   (a) dry milling a cocrystallized titanium chloride $AlCl_3$ catalyst component in which the titanium chloride is partially reduced and

   (b) activating the resulting milled catalyst component with an aluminum alkyl compound.

The counts now on appeal are modified versions of claims appearing in a patent[1] granted to appellees. Appellants Reed and Wilkinson originally copied the patent claims and added them to their application[2] in order to provoke this interference. The application was held to have insufficient supporting disclosure for those claims, however, and appellants were thus required to modify the claims to the form of the present counts.

1. U.S. Patent 3,032,510, entitled "Polymerization Catalyst", issued May 1, 1962, on an application filed June 27, 1958. The patent is assigned to Esso Research and Engineering Co.

2. Serial No. 816,050, filed May 27, 1959, for "Polymerization of Unsaturated Hydrocarbons", and assigned to Imperial Chemical Industries, Ltd.

Upon preliminary motion during the interference proceeding, appellants were made senior party by being granted the benefit, under 35 USC 119, of the filing dates of two earlier British applications, the earlier of which was filed on May 30, 1958. A motion to grant appellants the additional benefit of an earlier-filed United States application was denied on the ground that that application failed to disclose a critical limitation of the invention at issue.

In the proceedings before the Patent Office, testimony was submitted by appellees, Tornqvist and Langer, the junior party, in an attempt to establish, alternatively, either actual reduction to practice of the invention prior to any date asserted by the senior party, or an earlier conception coupled with the exercise of reasonable diligence from a time just prior to May 30, 1958 (the British convention date accorded the senior party) until the filing date of the Tornqvist et al. application on June 27, 1958. Relying solely on their asserted priority dates, the party Reed et al. took no testimony. Before the Board of Interferences, the parties also contested the propriety of the interlocutory rulings denying Reed and Wilkinson the benefit of the filing date of their earlier U.S. application but granting them the benefit of the British filing dates.

In holding for the junior party, Tornqvist et al., the board first found "no basis for reversing the holding of the Primary Examiner with respect to the prior Reed United States application." It thereafter went on to conclude that the evidence submitted by the junior party was sufficient to establish conception followed by reasonable diligence for the period just prior to the earliest British filing date relied on by the senior party up to the filing of the Tornqvist et al. application. In view of this holding, it was found unnecessary to further discuss the contentions regarding the British priority date and the asserted actual reduction to practice by Tornqvist and Langer.

The only issues which are before us on this appeal are whether the Board of Patent Interferences erred in concluding

(1) that the party Tornqvist et al. had established, by a preponderance of the evidence, that reasonable diligence had been exercised during the critical time period bridging the gap between a date just prior to the earliest conception date recognized for the party Reed et al. up to the constructive reduction to practice of filing their application for patent; and

(2) that the senior party Reed et al. were not entitled to the benefit of their earlier filed United States application, the filing date of which preceded the dates of the activity considered by the board on behalf of Tornqvist et al., on the ground that such application did not disclose the "dry milling" limitation of the invention in issue.

As pointed out by appellants, a decision in their favor on either issue requires a reversal of the board's decision. Since the two questions are completely independent and the diligence does not involve, to any great extent, consideration of the technical aspects of the invention, we will consider diligence first.

### THE QUESTION OF DILIGENCE

As mentioned earlier, the board based its decision in favor of Tornqvist and Langer on the fact that they had established a conception of the invention of the counts prior to the earliest date to which the senior party might be entitled (i.e., the date of the earliest filed British application) and coupled that with proof of due diligence up to the date of constructive reduction to practice. The board accorded to Tornqvist and Langer a conception date of April 21, 1958, the date of preparation of an initial draft of their application for the patent now involved in this interference. This holding is not challenged by Reed and Wilkinson. What appellants do challenge is the board's further conclusion that Tornqvist and Langer established reasonable diligence during the period from May 2, 1958, when a second application

draft was prepared, until the application was filed on June 27, 1958.

The facts in this regard, as we have gleaned them from the record, are as follows:

At the time in question, both Tornqvist and Langer were employed in the research laboratories of Esso Research and Engineering Company, at Linden, New Jersey. The above-mentioned second draft of the patent application was prepared by a Dr. Millson, patent attorney for Esso Research, whose office was located in Elizabeth, New Jersey (which, appellants tell us, is "a few miles away" from the Research Center). According to Dr. Millson's corroborated testimony, that second draft was mailed, on Tuesday, May 6, 1958, to a Mrs. Remenick, a patent liaison person at the Research Center, along with a letter requesting that the draft be checked by the inventors "for errors and completeness." Dr. Millson testified that a one- or perhaps two-day delay was normally involved in mailings between the two locations. One of the inventors, Dr. Langer, testified that he believed that he received his copy of the draft "very shortly thereafter" but couldn't say "exactly what date this was." The other inventor, Dr. Tornqvist, testified that he left for a vacation in Sweden on Friday, May 9, 1958, and did not recall receiving the draft prior to that time. The record indicates that during the time between Dr. Tornqvist's departure for Sweden and his return four weeks later, on Monday, June 9, 1958, no work at all was done by anyone on the application draft. Sometime during the period between June 9 and June 20, the draft was checked and corrections made, first by Dr. Tornqvist, then by Dr. Langer and the draft was returned to the patent department. Subsequently, commencing on Monday, June 23, 1958, Dr. Millson placed the application into final form, it was signed by the inventors, and it was filed in the Patent Office on Friday, June 27, 1958.

What we have, then, is a time period of some eight weeks, from Friday, May 2, 1958, when the second application draft was apparently typed until Friday, June 27, 1958, when the completed application was filed in the Patent Office. We are satisfied immediately that the record establishes reasonable diligence for at least the first week (during which the draft application was mailed to the patent liaison person and forwarded by her to the inventors) and the final three weeks (during which time the draft was reviewed by the inventors, sent back to patent counsel, and amended to final form taking into account what we observe to be not insignificant changes suggested by both inventors as evidenced by their written notations on the draft). The substantive controversy rages about the four weeks during which Tornqvist was in Sweden, away from his position, and Langer admittedly did nothing in the way of reviewing the draft application.

Appellants apparently do not contest the finding by the board that Tornqvist's inactivity was excusable. Primarily, they point to Dr. Langer's testimony as support for the proposition that he did not play a minor role in the inventive partnership which produced the subject invention and argue strenuously that "an extended vacation by one joint inventor is no excuse for inactivity by the other joint inventor." We are unable to accept this position.

As a general proposition of law, it is not *necessarily* inexcusable for one who has worked with another to produce jointly a single inventive concept to wait for the other's availability in order to jointly review an application for patent dealing with that inventive concept. Dealing specifically with the facts of this case, we find it not to have been unreasonable for Langer to have waited for Tornqvist's return before taking up review of their joint application. We note the following considerations:

(1) Dr. Tornqvist was expected to take only three weeks away from his job.

(2) The fourth week of Tornqvist's unavailability was occasioned by the un-

expected illness of his father (who did die a few months thereafter).

3. Even assuming that Dr. Langer did contribute substantially to the joint inventive effort, the record nevertheless provides substantial support for the board's conclusion that it would be "reasonable that the primary review of the draft would be by Tornqvist."

(4) Langer's inactivity did not otherwise prolong the delay in filing the application.

██ We have considered all the arguments of counsel and have viewed the record and the board's opinion in the light which counsel has provided but have found nothing to justify disturbing the holding of the board that appellees had exercised due diligence. Accordingly, we must now consider the second issue on appeal.

*Does the Earlier Reed et al. Disclosure Support the Invention of the Counts?*

The board found that the limitation as to *dry* milling in the process of the involved counts is a critical one. It then went on and, in effect, affirmed the ruling of the Primary Examiner that appellants' earlier filed U.S. application, in which the disclosure (otherwise apparently adequate) is no more specific than to state that the catalyst "powder was ground in a ball mill," does not support the limitation requiring that the milling be "dry". It is this holding which we must now review.

Appellants contend first that there is no "legal requirement" that their parent specification contain an "express statement" that the milling was "dry", and with this we cannot disagree. They also point out (correctly, we believe) that the examples in that specification fully disclose and expressly support the invention of the counts in every other detail and argue that logic would require that the disclosure of grinding in a ball mill be treated as an *inherent* disclosure that the milling may be carried out *with or without* the addition of any solvent.

The attractiveness of this proposition is undeniable. Nevertheless, what at first blush appears to follow from incontestable logic, begins to pale in the light of further facts which appellees have brought to our attention.

It is the appellees' assertion that, at the time of the original Reed and Wilkinson application, the common practice in the art was to ball mill powders such as the catalyst component here in the presence of an organic solvent—in other words, to carry out the milling in the "wet" state. In support of this proposition, appellees have concededly only submitted circumstantial evidence. Nevertheless, we are particularly persuaded by the following:

(1) The Tornqvist et al. patent and the Reed et al. application here involved as well as the two earlier British applications the benefit of which was accorded Reed et al. all specifically require that the ball milling of the metallic chloride catalyst component be carried out in the dry state.

(2) Appellant Reed (with a different co-inventor) disclosed in the specification of an application for Australian patent that if the metallic chloride component (in that case, titanium trichloride) of the catalyst is milled in the dry state, certain improved properties in the polymer produced therefrom result as opposed to when the component is milled wet. We have studied the disclosure and are convinced that the applicants there considered that their technique of dry milling the catalyst component was a unique and significant improvement over the acknowledged prior art method of wet milling.

Appellants here do not seriously contest that the Australian patent disclosure appears to contradict their position that, at the time of their first U.S. application, it was not an uncommon practice in the art to ball mill these catalyst components without the addition of a diluent. Rather they argue that the evidence on this point is inconclusive and that the Australian disclosure in fact supports the position that, when *wet*

**506**

milling was carried out, the diluent was always specified.

■ We have taken these arguments into consideration but are not convinced of error in the decision below. We point out first our satisfaction that there was substantial evidence to support the board's finding that the limitation in the counts to "dry" milling was critical. Since this limitation is a specific one and the language in the disclosure relied upon to support the count is, in this respect, general, without an explicit recitation of the specific limitation at issue, it became incumbent upon appellants to establish that that specific limitation was *inherently* included in the disclosure of their United States application. In other words, appellants were required to prove that the disclosure of their United States application was

> so worded that the *necessary and only reasonable* construction to be given the disclosure by one skilled in the art is one which will lend clear support to each positive limitation in the interference count.

Binstead v. Littmann, 242 F.2d 766, 44 CCPA 839 (1957).

As we alluded to earlier, appellants' attempt to establish a case in this respect was based first on an argument that logic required a holding in their favor, and thereafter on an attack on appellees' position which we have held defeated the logic of their first approach. We find little, if anything, in the record of a positive nature which can be relied on to satisfy the stated test for proving inherency. What there is falls too short of satisfying the burden placed on appellants as those who would provoke an interference by copying the claims of an issued patent. See Noyce v. Kilby, 416 F.2d 1391, 57 CCPA 1156 (1969); Gubelmann v. Gang, 408 F.2d 758, 56 CCPA 1013 (1969), *and cases therein cited.* We therefore conclude that the Board of Patent Interferences was correct in holding that appellants' earlier United States application did not support all the limitations of the counts on appeal.

There remains the question of the assessment of costs for the printing of a fifty page addition to the record as requested by appellees. In determining the outcome of this appeal we have found that only 20% at most of this additional material was useful in resolving the issues before us. The rest appears merely to have been included to bolster some of appellees' arguments where it was not really necessary. Accordingly, we find appellants' request that appellees bear the additional costs to be at least partially justified and hereby order that 80% of such costs be assessed against appellees.

The decision below is affirmed.

Affirmed.